Good morning, Your Honors. Good morning. Duane M. Hamilton for the petitioner. May it please the Court, Honorable Judges, HCFR 1208.6a's confidentiality guarantee is a contract with the asylum applicant that the government shall not disclose information contained in or pertaining to an asylum claim without the express, written consent of the applicant or an exercise of discretion by the Attorney General. This confidentiality guarantee has been interpreted in the legacy INS's June 2001 Cooper Memorandum and in this Court's Owino v. Holder. In both of those interpretations, where the applicant's identity can be linked to specific facts or allegations from the asylum claim, 1208.6a confidentiality is violated. In Owino v. Holder, where such confidentiality is violated, a remand becomes necessary then to explore the possibility of a further asylum claim arising out of the confidentiality breach. Well, counsel, let me just ask. Let's assume that it was a breach of confidentiality. Should remand without allegations that the people who mistreated LTM found out about the disclosure, was there any evidence that that information was shared with anybody? There need not be evidence, Your Honor, because if you consider the very reason for the confidentiality guarantee and why it has been interpreted in the way it has, it presupposes that when you give the impression that an applicant has applied for asylum in another country, it can engender the fury of people in the home country. So I think it is implied within the confidentiality violation, when that confidence is violated, then we have to presume that the process flowing out of that violation is poisoned. No, we don't have evidence yet, to the best of my knowledge, that that has happened. But this is the very purpose of HCFR 1208.6a. And so, you know, what we saw was a conclusion arising out of the confidentiality violation, that the Minuve letter was a fabrication. Well, do you contend that just sharing the letter with Dr. Nayib Bundy was sufficient to form the basis of a claim? It was, Your Honor, and here's why. Dr. Minuve's letter contained both the identity of the applicant, her name, and it also contained a specific allegation from her asylum claim, i.e., that she had been attacked in an allayed FGM attempt by the quasi-religious Mungiki sect. I think Dr. Nayib Bundy, as a man of letters, it wouldn't take him much to understand that the applicant is making an argument about an FGM attack. It's pretty obvious that she's applying for asylum, Your Honor. The government would have you ignore the facts in the record in favor of boilerplate language at the bottom of Investigator OU's investigative memorandum to the effect that USCIS, Nairobi, was aware of the confidentiality obligation and that they did not disclose or imply that an asylum application had been made. However, that is dispelled by the very four corners of the investigative memorandum itself, which states what Dr. Nayib Bundy found, and the investigative memorandum says that Dr. Nayib Bundy mentioned the petitioner's name. If you look at the Mnuvi letter that was also faxed to Dr. Nayib Bundy, again, it's got those allegations in it and it's got the name of the petitioner. So it's like giving you a white sheet of paper with a disclaimer that says, this sheet of paper is not white. The sheet of paper is obviously white. I thought Nayib Bundy's letter was particularly strong. He just came right out and said, this is a forgery, which was kind of an odd thing to me that he was being asked about a patient and then he comments on the legitimacy of the document. It was very odd, and this is why I did the request for administrative notice as to which entirely was overlooked in a lot of ways. Kenya is a hotbed of tribal conflict, and the investigator, OU, is a Luo. And I submitted the documents with my administrative notice request to show that that name is a Luo name and my client is a Kikuyu, and the Luo and the Kikuyus have been at odds for quite some time. And I cited the basis for my administrative notice request, and the BIA simply dismissed it saying that it should have been raised at the administrative notice. There are some things that are of such public knowledge or record as can be administratively noticed by a higher tribunal without it having been submitted in the trial court. So very odd indeed, Your Honor. My whole argument with regard to the fruit of the poison tree analysis was simply ignored by the Board of Immigration Appeals. They said something to the effect that the petitioner's arguments were based on speculation and conjecture. No, they weren't. They specifically pointed out the problem with disclosing her identity and allegations from the asylum claim and gave theories as to how that would imply she had applied for asylum, never addressed in the Board of Immigration Appeals decision. Are you claiming that the medical record, the medical letter was not fraudulent? Your Honor, I don't have the ability to know that, Your Honor. I know that I believe in my client. I believe in her sincerity. I believe in her honesty and integrity. Wasn't there evidence it was a forgery? There were findings that it was a forgery from Dr. Niyabundi, to whom the petitioner's name was disclosed and facts of her asylum claim were disclosed. And so Niyabundi, as a man of letters, could have figured out that she was applying for asylum and may have been annoyed. I don't know why he did what he did. I know that her confidentiality rights were violated. And ACFR 1208.6a has got to have meaning. There's got to be a consequence to violating that. All right. So but even if we go along with you on that one, what do we do with the finding of frivolousness? Right. Well, the frivolous finding has to be reversed. I mean, Owino, the holder, makes that very clear because in Owino, the remedy was remand to explore a further asylum claim. If the frivolous finding remains intact, she wouldn't be able to pursue an asylum claim potentially arising out of the violation of her confidentiality. And she also has to be able to pursue withholding of removal because, remember, frivolous finding does not bar withholding of removal under ACFR 1208.20. But if the frivolous finding stands, let's say she had to do a motion to reopen in the future. There's a CFR section, I believe it's ACFR 1003.23b4, lowercase Roman numeral I, that prevents motions to reopen. So let's say in the future she discovered some horrible thing arose out of this confidentiality violation. The frivolous finding would prevent her from even making a motion to reopen. So and then it was interesting how they dealt with withholding of removal because they stated, the BIA stated, we did not base our denial of withholding of removal on the frivolous finding. Well, I don't know how they could do that because a frivolous finding is such a powerful statement of adverse credibility in and of itself, but let's give them the benefit of the doubt. If, in fact, they did that, then we're dealing with residual credibility. We're going to have to throw out the entire overseas investigation, all of the evidence on what I call residual credibility. And, boy, if you review that residual credibility analysis, it was an exercise, a widespread exercise in speculation and conjecture. I'll just run some of it by you. In the demeanor, the adverse demeanor finding, the immigration judge found it that she avoided eye contact. They said that her calm demeanor was inconsistent with rape. They said that fierce dogs were chasing her when she never testified that fierce dogs were chasing her. She testified that she heard dogs barking in the distance. The judge made comments about what a strange thing for someone in Kenya to put in a medical report. Well, how would he know what is strange or what isn't strange for a Kenyan official or doctor to put in a medical report? Scars. They took to task a scar that she had that she claimed was made a certain way with, I believe, a hot knife. And I believe it was in Syntharolincum v. INS that this court had a problem with that. In that case, it was cigarette burns. It was a characterization of cigarette burns. There are so many of these, Your Honors. They're well briefed in my opening brief. I think you will find overall that the residual credibility finding on which they base their withholding denial does not stand in reference to the authority of this circuit. And I will, if I have a little time, I'll reserve it, if I may, for rebuttal. You have about three minutes. Thank you, Your Honors. Thank you. Good morning. Greg Pennington on behalf of the Acting Attorney General. I'll start with adverse credibility. Excuse my voice. I'm fighting a little cold here. I'll start with adverse credibility because that's where the immigration judge started with her first decision in 2006. Now, the frivolous finding was kind of at the end of her decision, her 40-page decision. But she started by saying that she did not find that Ms. LTM presented a credible claim of past persecution. So she initially denied the asylum application on adverse credibility grounds. And then only later did she find that the application was also frivolous based on her materially fabricating the hospital stay. And there were many parts to that finding on the hospital stay. It wasn't just the investigator's report from overseas. So as for adverse credibility, and the immigration judge recognized this, not any one of these things would have been grounds for an adverse credibility finding. But she said that the totality of the circumstances, just the sum total of all the testimony and the evidence presented led her to find that this was just a totally fabricated claim. She started with demeanor, obviously. And it wasn't just on how a rape victim should act. I wouldn't be here defending that. It was that she found that the testimony of the expert who Ms. LTM went in for all these visits, she told this expert that she was afraid of talking about these And then when she came into court, she was confident, and the immigration judge found that it was just well rehearsed. And then it just kind of went all the testimony from there. She just didn't believe it. And I recognize these are the harder credibility determinations to defend and for this court to review. So there's a lot of things that are quite problematic to me. One of them is that all the pictures of her physical scarring and the two experts who testified that those physical scars authenticated that she was, in fact, a victim of torture. And all of these comments that the IJ made about her demeanor and whatever, the experts were saying, well, she's a torture victim. She's suffering from post-traumatic stress disorder. How can that all be used to support an adverse credibility finding when it's so substantiated in the record? Well, the immigration judge took issue with both of the experts. First, the doctor that examined the scars and the burns and the pictures, I can't make much of them in the record. You say took issue. What do you mean took issue? Well, the immigration judge found that the scars that she visibly witnessed in the courtroom were inconsistent with a three-month hospital stay. She inferred that And on what basis did the immigration judge conclude that? I mean, for example, how would a United States immigration judge know whether a scar is consistent or inconsistent with a three-month hospital stay in Kenya? I would admit that that's not the strongest ground which the government's going to rely here. I think if we're going to go down each of these grounds, you're going to see that a lot of this, there's no way the immigration judge could have possibly have known. And I don't know. She spent a lot of time with the Program for Torture Victims. That's a reputable program. And they came in and supported her story of torture. Right. And the IJC says, no, but it didn't happen. There's pictures of cuts and, you know, other wounds. And the IJ says, but I don't believe that happened. The IJ surmised that that could have happened from anything. And, again, all this kind of flowed from her just not believing the story. And I'll start with kind of where the IJ started, which led her to the hospital visit at the Moy Teaching and Referral Hospital, is that she said that she escaped these four men that came in her house. She went through a barbed wire fence being chased by these men and fierce dogs. And contrary to my colleague's assertion, that's from her declaration she submitted in support of her asylum application. She said that she was chased by fierce dogs into the night. So she climbed through these barbed wire fences and ran barefoot for three hours, only to climb up into a tree and sleep in a tree overnight. And then a herdsman comes by and loads her onto a donkey cart and pays for her travels to a clinic. And then she gets transferred to another clinic where she has a three-month hospital stay for injury. She said she recovered from with no medical care previously. And that's kind of where all this comes into focus, is that three-month hospital stay. You know, she testified that she, again, didn't need medical care prior, but she needed three months of hospital care this time. And then there was the letter which she submitted documenting her hospital stay. And the letter is suspicious on its face. It's addressed to whom it may concern. If you look and compare it to the letter submitted by Dr. Nayabundi, it has a different telephone number and email address than the official letter submitted by Dr. Nayabundi. Again, it's addressed to whom it may concern and in patient history. It says, allayed FGM attack by the so-called Mungiki sect. You know, why would any doctor put that in patient history? So, again, the letter itself is suspicious on its face, and that's what prompted the government to conduct this overseas investigation. Mr. Pennington, did the IJ discredit Dr. Berthold, if I'm saying that correct? She saw her 91 times. The way I got the discrediting was solely based upon the fact that the visits took place after her application. Was there any other reason that she was discredited? The only other reason I could point to, and I do remember the immigration judge took issue with, you know, she didn't see anybody until after her application was denied. But she said that this expert witness did not have evidence that she had submitted a fraudulent record in support of her application. And when asked about that, Dr. Berthold said that, you know, that's something that she would take into account in determining whether one of her patients was malingering. But there was nothing, you know, that she could really discredit an expert witness on. I mean, the expert had. But she did. She said that the expert witness's testimony could not supplant otherwise incredible testimony. So the thing about the letter, I'm focused right now on the frivolousness finding. That was based solely on the letter? I would say that it's based on the three-month hospital stay. I would say that it's the sum total of the testimony and evidence presented on that hospital stay. The standard for frivolousness is that you have to put in fraudulent testimony on an element of your asylum claim? Fabricating a material element. Fabricating a material element. Okay. Well, is the hospitalization an element of her asylum claim? I would say that it would be. One element of an asylum claim is demonstrating past persecution. And this goes to whether she suffered past persecution. She said that she. Well, it's evidence relating to an element. But it's not the element. Because if you took all the rest of her testimony as true, she can easily establish past persecution. That's the element that she has to establish. Right. I'm not aware of any cases that kind of flesh out this, what's an element for frivolousness. I mean, there's very little case law. There's a lot of case law. I'm not discussing the material element. Well, I mean, I think this is one piece of evidence that goes to establishing her past persecution. That's my point. And past persecution is the element. You know, the other elements are on account of a protected ground by the government or persons the government is unable to control. Those are the elements of a persecution claim. Right. Well, as far as it's submitted in support of establishing one of the elements, I would say that submission of a fraudulent document should be sufficient. I guess what I'm going to is she didn't need to put this hospitalization in at all. Right. And I don't think the immigration judge would have needed the hospital record at all to find frivolousness. No, he wouldn't have needed that at all, right? Right. But she did. And then we have the investigator's report. Well, if she really thought it was a fraudulent document, why would she do it if she didn't need to put it in? Well, maybe for corroboration. Is this a post-Real ID Act case or a pre-Real ID? This is a pre-Real ID Act case. Pre-Real ID. So she really didn't need corroboration. Well, asylum applications were still denied for corroboration pre-Real ID Act. Not this one. The Real ID Act just kind of codified it. But certainly she didn't need to submit it to her testimony alone, Right. That's why it's such a curious thing to me and why, you know, sort of the frivolousness finding stands or falls on that document, that she didn't need to submit to prove an element of her claim. But she did. It's an odd thing. Right. But we have it, and we also have the deputy director of the hospital where she allegedly stayed saying that she was never a patient there and the doctor that she alleged treated her was not a physician there and that the document just was a forgery. Again, I think that's an odd term. But then her expert says, well, they didn't even keep electronic records. They didn't really keep the records all in order, and, you know, I worked there. They have no record that I worked there. Well, he said that this witness that she presented also, as the agency found, undercut several aspects of that alleged hospital stay. Again, he offered to personally verify her stay there. He says, I'm going to Kenya. I teach at this hospital. I do rounds at this hospital. If you want me to check it out, I can verify that you were actually seen there or I can take the letter with me and verify that it's authentic. And she did not take him up on that offer. I think that's pretty telling. But then this witness of hers went on in her testimony, his testimony rather, to say that this letter is odd. Written discharge letters are rarely given, and if they were, they would be handwritten, not typed. They almost certainly would not be addressed to whom it may concern. The records would have a reference number, a medical ID number, which her record did not. There are paper records, but as doing research there, he was able to collect medical records. He also established that Dr. Nayibundi was a reputable individual at this hospital that should be trusted to look at these records and verify whether a doctor did or did not work or treat patients there. Counsel, before your round of time, I'd like to move to the question of, if we find the disclosure of the medical letter under the Owino case was a breach of confidentiality, why shouldn't we remand this case to the immigration courts to consider whether the disclosure resulted in new threats that may give rise to a new asylum or withholding or CAC claim? Under Owino, remand would be appropriate if the court were to find a breach of the confidentiality provisions, but the government would urge the court to distinguish Owino in several respects. First, the embassy employee in Owino took the jail records directly to police officers, government officials in Kenya, and that was, in my view, factored into the Owino decision that you're taking these documents and giving them to people that you allege persecuted you. Here, it was sent to, you know, this doctor from a referral hospital, one of the largest ones in Kenya, and there's no evidence submitted that this doctor would submit these, if there was an inference there was an asylum claim, give these records or information that Ms. LTM submitted an asylum claim to a government official or to her family members. But isn't this a factual determination that the IJ should make? Sure, I think so, but that would kind of move me to my second point. Traditionally, when the court finds a regulatory violation, if it's not mandated by the Constitution, then the moving party still has to show prejudice. And I think this kind of follows from my last statement, is where would the prejudice be if there's no disclosure of this inference that she has applied for asylum to people who would harm her on that basis? But that hasn't yet been determined. No, it has not. If there's no further questions, I'm down to my last seconds. All right, thank you very much, counsel. Thank you. Your Honors, just briefly, with regard to the Mnuve letter, I believe the immigration judge had found it strange that she was coming to the United States to attend college and would bring such a letter. It was clear that she was coming to the United States from the record in flight from persecution. And I just wanted to make that point about that letter. I think some of the characterization of why she brought the letter with her, I think, was mischaracterized in the record also. Had she gone to Cal State Fullerton previously and then returned to Kenya? There was something in the record about how having gotten some education, her dowry would be greater in Kenya. Oh, yeah. No, I think that was the issue of, well, why wasn't she circumcised by 19? Because I think there was some claim that Kikuyu's are circumcised by 19. I can't remember how it came up. And I think the immigration judge, I can't remember whether it was the immigration judge or the board, found that she had given no reasonable explanation as to why she wasn't circumcised by age 19. She testified that it had been decided in her family that if she was allowed to finish school before circumcision, she would fetch a higher dowry, and that in the Mungiki culture, women are often circumcised before marriage. That was part of the record. So the claim that she gave no reasonable explanation even there was just factually incorrect. Your Honors, I'll rest, and thank you for your time today. All right. Thank you very much, Counsel. Both of you did an excellent job. Thank you. Thank you. LTM versus Whitaker will be submitted.
judges: D.W. Nelson, Wardlaw, Pratt